

P-send

FILED

APR - 5 2006

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY_____DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KIRKLAND O'HARA,<br><br>        Petitioner,<br><br>        v.<br><br>JAMES HALL, WARDEN,<br><br>        Respondent. | Case No. SACV 03-1227-NM (MLG)<br><br>REPORT AND RECOMMENDATION OF<br>UNITED STATES MAGISTRATE JUDGE |



DOCKETED ON CM

APR - 5 2006

BY_____040

I.  **Background**

    A.  **Facts**

    In the mid-1990s, Petitioner Kirkland O'Hara was involved in a live-in relationship with Dawn Hill.  By July 1995, the relationship was in trouble.  Petitioner was upset because he suspected that Hill was engaging in sexual relationships with other men.  Petitioner had assaulted Hill and threatened to kill her. In July 1995, Hill decided to ask Petitioner to leave her home.

    On July 8, 1995, Robert Hill, who had previously been married to Dawn, received a call from her.  Dawn, who sounded terrified, told

1  Robert Hill that Petitioner had threatened to kill her.  Later that
2  day, both Petitioner and Dawn Hill were shot while in Dawn's home.
3  The wounds to Hill were fatal. Petitioner called 9-1-1, requesting
4  an ambulance. When asked by the dispatcher who had shot whom,
5  Petitioner answered that it had been "kind of a dual effort." A
6  responding paramedic saw gunpowder burns on Petitioner's tongue and
7  on the inside of his mouth, but not elsewhere on his face.  Dawn had
8  been killed by a single gunshot to the middle of her chest which
9  entered her heart. There was no gunpowder stippling near Dawn's wound
10 or on her clothing.

11     Over time, Petitioner made a series of conflicting statements
12 about how the shootings occurred. These statements were introduced
13 into evidence at trial by the prosecution.  While being evaluated by
14 a psychiatrist at a hospital on July 11, 1995, Petitioner stated that
15 Hill had shot him and then shot herself. (R.T. 642-44)    In
16 handwritten responses during an interview with police the next day,
17 Petitioner claimed that he and Hill fought over the gun and that he
18 tried to take it away from her. (R.T. 616-632). In two subsequent
19 interviews, Petitioner claimed Hill had said she had to kill both of
20 them, and after being shot by her, he lost consciousness.  Later,
21 Petitioner claimed that he attempted to pick up the gun after he had
22 been shot.  In another interview, Petitioner claimed that after being
23 shot in the mouth by Hill, he grabbed the weapon and fired it but
24 without aiming at her. (C.T. 482-91).

25     At trial, Petitioner testified that in the months before the
26 shooting, Hill had been talking about death.  On July 8, 1995, he
27 found her in the bathroom crying and exclaiming that she did not want
28 to live this way anymore.  Hill picked up the gun, approached

2

1  Petitioner and pointed the weapon at his head.  The next thing
2  Petitioner recalled was feeling as if he were floating outside of his
3  body. He did not recall actually grabbing the gun or shooting Hill.
4  **B.   Procedural History**
5      Following a jury trial, Petitioner was convicted of second
6  degree murder with a personal use of a firearm enhancement. Cal.
7  Penal Code §§ 187(a), 12022.5(a)). On November 14, 1997, the Orange
8  County Superior Court sentenced Petitioner to a term of twenty-five
9  years to life in prison.  On February 29, 2000, the California Court
10  of Appeal affirmed the judgment. On May 17, 2000, the California
11  Supreme Court denied his petition for review.
12      On May 9, 2001, Petitioner filed a petition for writ of habeas
13  corpus in this Court. On May 16, 2001, this Court dismissed the
14  petition with leave to amend because the petition failed to clearly
15  state any violation of the Constitution as a basis for relief. On
16  August 10, 2001, after Petitioner had not filed an amended petition,
17  this Court dismissed the petition without prejudice.
18      On August 22, 2001, Petitioner filed a petition for a writ of
19  habeas corpus in the Orange County Superior Court.  The superior
20  court denied that petition on September 14, 2001. Petitioner then
21  filed a petition for writ of habeas corpus in the California Court
22  of Appeal on October 3, 2001, which was denied.  Petitioner
23  subsequently filed a petition for a writ of habeas corpus in the
24  California Supreme Court on December 13, 2001, which was also denied.
25      On August 20, 2003, Petitioner filed the Petition presently
26  before this Court. On January 26, 2004, this Court dismissed the
27  Petition, finding that it was untimely filed.  However, on July 22,
28  2005, the United States Court of Appeals for the Ninth Circuit

3

reversed the judgment of this Court and remanded for further proceedings. The parties have filed supplemental briefs addressing the merits of the claims and this matter is now ready for decision.

## C.   Petitioner's Claims

Petitioner raises ten grounds for relief, all of which are exhausted. In the first two grounds, Petitioner contends that both trial counsel and appellate counsel were ineffective in failing to raise many of the grounds put forth for habeas relief. In ground three, Petitioner asserts that he is unconstitutionally being denied custody credit by state prison officials. In grounds four and five, Petitioner challenges the constitutionality of two jury instructions given by the trial court, one related to murder, the other to the use of evidence of other bad acts. In ground six, Petitioner asserts that there was insufficient evidence to support his conviction. In ground seven, Petitioner claims that he was unconstitutionally denied a *Marsden* Hearing.[1] In grounds eight and nine, Petitioner claims jury bias based upon comments made by a prospective juror during voir dire and because of juror misconduct. In ground ten, Petitioner asserts that the admission of prior bad act evidence violated his Due Process rights. The Court will address each of Petitioner's arguments, first addressing the substantive claims and then addressing the claims of ineffective assistance of counsel based upon the failure of counsel to raise certain of those substantive claims.

\\

\\

---

[1] Under *People v. Marsden*, 2 Cal. 3d 118 (1970), the trial court must make an inquiry when a defendant seeks to discharge his counsel and asserts inadequate representation.

## II.    **Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a federal court may grant a writ of habeas corpus to a state prisoner with respect to a claim that was adjudicated on the merits in state court only if the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if the ruling was "based on an unreasonable determination of the facts in light of the evidence presented" in the state courts.

A state court decision is "contrary to" clearly established federal law if the state court failed to apply the correct controlling authority from the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The Supreme Court explains that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002)(quoting *Williams*, 529 U.S. at 405-06). A state court need not cite or even be aware of Supreme Court precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003)(citing *Packer*, 537 U.S. at 7).

A state court decision involves an "unreasonable application of" clearly established federal law if the state court identifies the correct governing legal principle from the decisions of the Supreme Court, but unreasonably applies that principle to the facts of the

5

1   case.  *Williams*, 529 U.S. at 407-08, 413.  Under this standard, a

2   habeas court may not issue the writ simply because that court

3   concludes "in its independent judgment" that the state court decision

4   is incorrect or erroneous.  *Williams*, 529 U.S. at 410, 412; *Woodford*

5   *v. Visciotti*, 537 U.S. 19, 24-25 (2002).  The reviewing court must

6   find that the state court's application of clearly established law

7   was objectively unreasonable.  *Williams*, 529 U.S. at 409.

8         A state court decision is based on an unreasonable determination

9   of the facts if "an appellate panel, applying the normal standards

10  of appellate review, could not reasonably conclude that the

11  finding[s] [are] supported by the record."  *See Taylor v. Maddox*, 366

12  F.3d 992, 1000 (9th Cir.), *cert. denied*, 125 S.Ct. 809 (2004).  Once

13  a state court's fact-finding process survives an "unreasonable

14  determination" challenge, the state court's findings of fact are

15  presumed to be correct.  *Id.*; 28 U.S.C. § 2254(e)(1).  To overcome

16  this presumption, a habeas petitioner must show by clear and

17  convincing evidence that the state court's factual findings were in

18  error.  *See* 28 U.S.C. § 2254(e)(1); *Taylor*, 366 F.3d at 1000 ("State-

19  court fact-finding may be overturned based on new evidence presented

20  for the first time in federal court only if such new evidence amounts

21  to clear and convincing proof that the state-court finding is in

22  error").

23        The claims raised in the instant Petition were raised before the

24  California Supreme Court, but that court did not issue any written

25  opinions.  Nevertheless, "[w]here there has been one reasoned state

26  judgment rejecting a federal claim, [federal courts are to presume]

27  later unexplained orders upholding that judgment or rejecting the

28  same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S.

6

797, 803 (1991).  The California Court of Appeal rejected the claims based on juror bias, jury misconduct and admission of evidence of prior uncharged conduct in a written decision on direct appeal.  Thus, this Court will consider the reasoning of the California Court of Appeal to determine whether the California Supreme Court's decision is contrary to, or an unreasonable application of, federal law. Because there is no reasoned decision addressing the merits of the claims raised in Grounds One, Two, Three, Four, Five, and Six, this Court must conduct "an independent review of the record" to determine whether the state's decision was an objectively unreasonable application of Supreme Court precedent.  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

III.  **Discussion and Analysis**

    A.  **Petitioner is Not Entitled to Relief on The Custody Credit Claim**

    Petitioner asserts that after arriving at prison, he was informed that he could only earn credits for up to fifteen percent of his ten-year determinate sentence on the firearm-use enhancement. Petitioner argues that he should earn greater credits for the firearm-use enhancement under Cal. Penal Code §2933.[2]

\\

---

[2]As a matter of state law, it appears Petitioner's assertions are without merit.  Petitioner can only earn credit for up to fifteen percent of the murder sentence. Petitioner claims that he should be able to earn greater credit on the fire-arm enhancement. This appears incorrect because an enhancement allegation is not a crime. See *People v. Vorbach*, 151 Cal App. 3d 425, 430 (1984). Therefore, under California law, Petitioner is entitled to only fifteen percent conduct credit on the sentence because the enhancement is attached to the murder conviction.

1     Federal habeas relief does not lie for errors of state law.
2 *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).   Absent a showing of
3 fundamental unfairness, a state court's misapplication of its own
4 sentencing laws does not justify federal habeas relief.   *Christian*
5 *v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994); *Aceves v. Blanks*, 2003
6 U.S. Dist. LEXIS 23098 *4-6 (N.D. Cal. 2003).   Petitioner has made
7 no such showing.

8     To the extent Petitioner is claiming a violation of the
9 California Penal Code, his claim is not cognizable.   *Pulley v.*
10 *Harris*, 465 U.S. 37, 41 (1984).   Construing the claim as one
11 asserting that the state's application of the California Penal Code
12 infringed his constitutional rights, Petitioner has failed to
13 demonstrate that any United States Supreme Court precedent supports
14 his position.  His conclusory allegations of constitutional violation
15 does not suffice to warrant habeas relief.   *Jones v. Gomez*, 66 F.3d
16 199, 205 (9th Cir. 1995); *James v. Borg*, 24 F.3d 20, 26 (9th Cir.
17 1986).

18     **B.**    **Petitioner Was Not Denied Due Process By the Admission of**
19     **Evidence That He Committed Prior Acts of Violence Again**
20     **Former Girlfriends**

21     As he did on direct appeal, Petitioner contends that his
22 Constitutional right to a fair trial was violated when the trial
23 court admitted evidence of his prior acts of violence against four
24 former girlfriends.

25     Prior to trial, the prosecution filed a motion in which it
26 sought permission to present evidence that Petitioner had committed
27 assaults on five former girlfriends-Camille Ollinger in 1975, Jamie
28 Ryder in 1984, Jacqueline Trinka in 1984, Connie Stafford in 1985,

1    and Rebecca Edmunson in 1986. (CT 230-61, 289-318). The trial court
2    found the testimony of Camille Ollinger, Connie Stafford, and
3    Jacqueline Trinka admissible as part of the prosecution's case-in-
4    chief to establish the existence of a common design or plan, motive,
5    lack of accident, absence of mistake, and defendant's state of mind.
6    Rebecca Edmunson was later permitted to testify as a rebuttal witness
7    for the prosecution, after Petitioner testified that he had never hit
8    anyone who had not struck him first. Petitioner was cross-examined
9    about his violent treatment of Jamie Ryder. Ryder herself was unable
10   to testify because she had been injured in an accident.

11       The following summarizes the women's testimony. Petitioner
12   physically abused Camille Ollinger during the course of their
13   relationship, which lasted from one to two years, in the mid-1970s.
14   (CT at 250-51). One of the assaults occurred after Petitioner told
15   Ollinger that he had been following her and had seen her dancing with
16   another man. (CT at 251). After knocking Ollinger to the ground and
17   then choking her until she lost consciousness, Petitioner put a knife
18   to his wrist and threatened to commit suicide. (CT at 251).

19       Connie Stafford testified that she lived with Petitioner for
20   several months in 1985. (CT at 255). Petitioner physically assaulted
21   her at times. (CT 255-56). One time, Petitioner dislocated her jaw.
22   On another occasion, Petitioner pointed a gun at Stafford's head and
23   then at his own head.   Stafford later moved out, but Petitioner
24   continued to harass her.

25       Jacqueline Trinka testified that she met Petitioner in 1986 and
26   lived with him for several months.  (CT at 253, 255).  When she
27   attempted to leave Petitioner, he threw her down on a bed and then
28   punched her until she was unconscious. (CT at 254).  For a week and

a half, Petitioner kept her imprisoned in the bedroom they shared. (CT at 254).  After that assault, Petitioner threatened suicide. Later, Trinka told Petitioner that she loved him and would never leave him.  After gaining Petitioner's confidence, Trinka was able to leave for another city for what she said was a stay of three or four days. Trinka never returned, leaving all of her possessions at the place she had lived with Petitioner. (CT at 255).

Rebecca Edmunson testified that while she dated Petitioner, he assaulted her twice.  (CT at 257).  On one occasion, after arriving at Petitioner's home, Edmunson tried to run away from Petitioner, but he threw her against a car, causing an injury to her head and a loss of consciousness.  When Edmunson awoke, she found herself in Petitioner's trailer. Petitioner would not allow her to leave. (CT at 257). After Edmunson broke up with Petitioner, he sent her letters saying he wanted to commit suicide because of the breakup. (CT at 258).

The California Court of Appeal found that the trial court properly admitted this testimony. The Court of Appeal found that under Cal. Evide. Code § 1101, the uncharged crimes and wrongful acts were permissibly introduced to prove common design or plan, intent or absence of mistake or accident.  The Court of Appeal noted that Petitioner's pretrial statements regarding who shot whom put at issue his mental state and the existence of a common design or plan.

Petitioner has not established a violation of due process based on the admission of the prior bad act evidence.  Violations of state evidentiary law are not cognizable in a federal habeas corpus petition.  *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475 (1991).  Thus, a habeas corpus petitioner may not challenge an

1  evidentiary ruling on the grounds that it violated the state's

2  evidence code. *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir.

3  1991). Rather, an evidentiary ruling may be challenged only if it

4  rendered the trial so fundamentally unfair as to violate due process.

5  *Leavitt v. Arave*, 383 F.3d 805, 829 (9th Cir. 2004). "A habeas

6  petitioner bears a heavy burden in showing a due process violation

7  based on an evidentiary decision." *Williams v. Stewart*, -F.3d-, 2006

8  WL 770608 at *5 (March 28, 2006); (quoting *Boyde v. Brown*, 404 F.3d

9  1159, 1172 (9th Cir. 2005)). Only if there are no permissible

10  inferences the jury may draw from the evidence can its admission

11  violate due process. *Jammal*, 926 F.2d at 920. On habeas review, a

12  state court's determination that evidence has probative value is

13  given great deference. *See e.g., Ortiz-Sandoval v. Gomez*, 81 F.3d

14  891, 897 (9th Cir. 1996).

15      The Court of Appeal found that the challenged evidence was

16  relevant to intent, an element of the charged offense, and the Court

17  does not find any error in this conclusion. *See* California Penal

18  Code § 350(e)(2); *McKinney v. Rees*, 993 F.2d 1378, 1380 (9th Cir.

19  1993)(holding that the admission of evidence of prior bad acts

20  comports with due process so long as such evidence is relevant to any

21  element of the charged offense, and the evidence is not introduced

22  to show a defendant's predisposition to commit a crime); *Jammal*, 926

23  F.2d at 918. Moreover, any possible prejudice from the prior bad

24  acts evidence was mitigated by the trial court's instructions

25  regarding the limited use for such evidence. *See Walters v. Mass*,

26  45 F.3d 1355, 1357 (9th Cir. 1995). The trial court instructed the

27  jury to consider the evidence that Petitioner committed other crimes

28  for the limited purposes of proving motive, intent, identity, common

scheme or plan and knowledge, but not as evidence of criminal propensity. (TR at 773-74). Under these circumstances, the state courts' rejection of Petitioners' claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

### C.  Petitioner's Due Process Rights Were Not Violated When the Jury Was Instructed with CALJIC No. 2.50.1

After agreeing to allow the prosecution to introduce evidence that Petitioner had assaulted four former girlfriends, the court instructed the jury with CALJIC No. 2.50 (evidence of other offenses) both during trial and during the final instructions. That instruction stated that evidence of prior offenses could not be considered as evidence that Petitioner is a person of bad character or has a disposition to commit crime, but only for the purpose of showing motive for the commission of the crime. (TR at 773-74, 2544-45). The trial court also instructed the jury, in conformity with CALJIC 2.50.1, that in order to be considered at all for this limited purpose, such uncharged offenses need be proven by a preponderance of the evidence. (TR at 2545-46).

Petitioner argues that the language of CALJIC No. 2.50.1 violated his right to a fair trial "because it raises Petitioner's level of proof higher than that of the prosecution's" and allowed the prosecution to prove Petitioner's guilt only by a preponderance of the evidence.

In order to secure relief from this Court on a claim of instructional error, a petitioner must demonstrate a violation of the Constitution. *Estelle v. McGuire*, 502 U.S. 62, 71-73, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The fact that an instruction was allegedly

1  incorrect under state law is not a basis for habeas relief.  *Id.*
2  Thus, to obtain relief based on a charge to the jury, a petitioner
3  must establish not merely that the instruction was undesirable,
4  erroneous, or even universally condemned, but that it violated some
5  right which was guaranteed to the petitioner by the Fourteenth
6  Amendment.  *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 38
7  L.Ed.2d 368 (1973).  That is, the central inquiry is whether the
8  instruction in question so infected the entire trial that the
9  resulting conviction violates due process.  *Id.* at 147.  The
10  instruction at issue in this case does not meet this high standard
11  of error. Indeed, the United States Supreme Court has indicated that
12  to be considered for a limited purpose, other crimes evidence need
13  only be proved by a preponderance of the evidence. *Estelle*, 502 U.S.
14  at 73-74.  That is exactly what was instructed in this case.

15      Petitioner asserts that the use of this same instruction was
16  found unconstitutional by the Ninth Circuit in *Gibson v. Ortiz*, 387
17  F.3d 812 (2004).  However, the use of the instruction in that case
18  can be distinguished from its use here.  In *Gibson,* the Court found
19  error where CALJIC No. 2.50.1 was used to instruct the jury that
20  "facts of prior alleged offenses need only to be proven by a
21  preponderance of the evidence to support an inference that Gibson had
22  committed the charged offenses". *Id.* at 822-23.  No such instruction
23  was given in the present case.   The trial court did not instruct the
24  jury that evidence of Petitioner's prior acts of domestic violence
25  could be used to show that he had murdered Dawn Hill. (TR at 499-
26  500). Rather, the court told the jury only that, if proven by a
27  preponderance of the evidence, the uncharged offenses could be
28  considered as evidence of Petitioner's motive.  The court explicitly

instructed the jury that the prosecution was required to prove Petitioner's guilt of the charged offenses beyond a reasonable doubt. (TR at 2549). Accordingly, the use of CALJIC No. 2.50.1 in this case did not violate Petitioner's Due Process rights.

**D.   The Trial Court's Murder Instruction Did Not Violate Petitioner's Due Process Rights**

Using CALJIC No. 8.30, the court instructed the jury that second degree murder is the unlawful killing of a human being with malice aforethought where the evidence is insufficient to establish deliberation and premeditation. (TR at 2556). The court also instructed the jury:

> "Murder of the second degree is [also] the unlawful killing of a human being when:
>
> 1. The killing resulted from an intentional act,
>
> 2. The natural consequences of the act are dangerous to human life, and
>
> 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
>
> When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being." (TR at 2556-57).

Petitioner challenges the murder instruction because it failed to include the phrase, "In order to prove such a crime each of the following elements must be proven..." Petitioner provides no explanation for why the absence of this phrase would make the instruction improper under state or federal law.

14

1    As noted previously, to obtain habeas relief based on an
2 instruction to the jury, a petitioner must establish not merely that
3 the instruction was undesirable, erroneous, or even universally
4 condemned, but that it violated some right which was guaranteed to
5 the petitioner by the Fourteenth Amendment. *Cupp v. Naughten, supra.*
6 Petitioner has made no such showing. Thus, the state courts acted
7 reasonably in denying Petitioner relief on this claim as the
8 challenged instruction properly informed the jury of the elements of
9 second degree murder.

10   **E.   The State Courts Acted Reasonably In Finding That The**
11   **Evidence Was Sufficient To Support Petitioner's Conviction**
12   Petitioner contends that the evidence was insufficient to
13 support his conviction for second degree murder. Specifically, he
14 asserts that the forensic evidence was inconclusive on the issue of
15 who shot whom first, and that the determination of this fact was
16 crucial to the prosecution's case. Petitioner asserted that he was
17 shot first, and that the shooting of Dawn Hill was in self defense.

18   The legal standard for evaluating sufficiency of the evidence
19 claims is clearly established. *Jackson v. Virginia*, 443 U.S. 307,
20 99 S. Ct. 2781 (1979). "[T]he applicant is entitled to habeas corpus
21 relief if it is found that upon the record evidence adduced at the
22 trial no rational trier of fact could have found proof of guilt
23 beyond a reasonable doubt." *Id.* at 324; *see also Turner v. Calderon*,
24 281 F.3d 851, 881-82 (9th Cir. 2002). The reviewing court's task is,
25 therefore, not to determine whether the evidence adduced at trial
26 established guilt beyond a reasonable doubt but rather, whether after
27 viewing the evidence in the light most favorable to the prosecution,
28 any rational trier of fact could have found the essential elements

beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19; *Turner*, 281 F.3d at 881-82. This standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16. Moreover, on habeas review the court must apply the *Jackson* standard "with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The court must ask "whether the decision of the California Court of Appeal reflected an 'unreasonable application of' *Jackson* . . . to the facts of this case." *Id.* at 1275.

In this case, the state courts acted reasonably in finding that sufficient evidence supported Petitioner's conviction. At trial, Petitioner admitted having the gun in his hand but said he could not remember firing the bullet that killed Dawn Hill. However, Petitioner gave contradictory versions of how Dawn Hill was killed. He told psychiatrist Chun Kee Ryu that Hill shot him and then committed suicide. After being told by police that the physical evidence showed that Hill did not shoot herself, Petitioner acknowledged that he could have shot Hill.

The evidence also demonstrated a motive for murder. Petitioner was upset that Hill was continuing to see Chuck Carter, Hill's former boyfriend. Hill's friend, Teddi Lester, testified about threats Petitioner had made to kill Hill. (TR at 941-42, 949-50). Judith Barnes, another friend of Hill, was told by Hill that she was "scared to death" of Petitioner and that he was threatening her. (TA at 2030). In a telephone conversation with both Hill and Hill's mother that was tape recorded about two months before Hill's death (TR at 1753), Petitioner acknowledged that he had once said maybe he was supposed to "kill us all." (TR at 537). A few months prior to her

death, Hill had called Petitioner's surrogate father Stephen O'Hara and reported that Petitioner was threatening to commit suicide. (TR at 1114-17, 1138-39, 1149).

Shortly before her death, Hill told Teddi Lester that the next weekend she was going to ask Petitioner to leave her home within two weeks, even though she was very scared about asking him to do so because of what had happened in the past. (TR at 943-44, 964-54). Hill stated that when she had previously asked him to leave, Petitioner would get very angry. (TR at 963-64). Hill also told her brother, Christopher Waddell, that she was going to ask Petitioner to move out that weekend. (TR at 1339, 1344-46). Most importantly, about an hour before the shooting, Dawn Hill called her former husband Robert Hill and, sounding terrified, told him that Petitioner had threatened to kill her. (TR at 1451-52, 1458).

There were gunpowder burns on Petitioner's tongue and on the inside of his mouth, but not elsewhere on his face. (TR 522-25). The prosecution argued that it did not ring true that Hill would have been able to place a gun inside Petitioner's mouth. Petitioner had a jealous nature and had assaulted former girlfriends and talked of suicide when they had tried to break off their relationship with him. Ample evidence supported Petitioner's conviction for murder. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19. Thus, Petitioner's insufficiency of the evidence claim is without merit.

\\

\\

\\

17

**F.   Petitioner Was Not Denied His Right to a *Marsden* Hearing.**

Petitioner complains that his counsel did not forward to the trial court a letter in which Petitioner requested a *Marsden* Hearing.[3]  Petitioner states that he wrote the letter to the court and asked his trial counsel to deliver it, but that counsel failed to do so. (Petition at "Ground Seven").  Petitioner has not provided the Court with a copy of the letter, the record contains no such letter, and Petitioner has not informed the Court of when this letter was written nor the contents of the letter.  Therefore, the Court has poured over much of the 3000 plus pages of transcript, attempting to discern what facts, if any, support this contention.  The transcript is littered with testimony about letters written and submitted to counsel.   There are numerous discrepancies about these letters, apparently because Petitioner made so many complaints and contacted the Court on so many issues. Accordingly, there is confusion about what letter he now bases this claim upon.

The Court has done the best it can to reconstruct the likely sequence of events.  The record could lead one to conclude that a *Marsden*-type letter was written by Petitioner prior to the close of trial, given to Petitioner's counsel before the verdict, but then submitted by counsel after the jury had reached a verdict in the case.[4]   However, it is also possible that the letter was written,

---

[3]*People v. Marsden*, 2 Cal. 3d 118 (1970)

[4] Petitioner had three attorneys before the appointment of attorney Frank Ospino.   The record demonstrates that Petitioner had one *Marsden* hearing on June 24, 1996, before his trial began, as well as a second hearing shortly before verdict on March 5, 1997 that will be discussed shortly. At the first hearing, a representative of the Public Defender indicated that she believed all three offices of the Public Defender were conflicted out of the case because Petitioner had a problem with "court appointed public counsel in general." (TR at 119-21).

1  given to Petitioner's trial counsel, and filed entirely after the

2  verdict was announced.

3        Frank Ospino, Petitioner's trial counsel, testified at a motion

4  for new trial.  His testimony was at best confusing on this issue.[5]

5  The verdict was announced by the jury on March 6, 1997.  At a hearing

6  on a motion for new trial held in the Orange County Superior Court

7  on October 24, 1997, Ospino testified and commented on Petitioner's

8  testimony earlier that day in which he complained that he had sent

9  Ospino a letter requesting a *Marsden* hearing which Ospino never

10 filed.  Ospino stated: "I have a copy of the letter.  It has a file

11 stamp.  It was filed March 28, 1997".  (RT 2742).  When further asked

12 about the letter, Ospino testified that Petitioner wrote and gave him

13 the letter requesting a *Marsden* hearing on March 4, 1997, prior to

14 verdict, that Ospino told the Court about the letter at that time,

15 but then did not actually file the letter until after the verdict,

16 when Petitioner complained about the fact that it was never filed.

17 (RT at 2855).

18       The record also demonstrates that a hearing outside of the

19 presence of the prosecutor was held on March 5, 1997, the day before

20 the verdict was reached and after Petitioner purportedly submitted

21

22 _____

23       [5]Mr. Ospino testified that Petitioner wrote the letter requesting
   the *Marsden* hearing after the verdict, and after the closed hearing
24 held before the trial judge on March 5, 1997.  Mr. Ospino stated,
   "Quite frankly, I forgot to file it." After Petitioner complained, he
25 later filed it on March 28, 1997. (TR at 2852). Mr. Ospino reiterated
   this position later in his testimony, stating that he did not think
26 that Petitioner ever wrote a letter during the trial.  (TR 2854).
   However, Mr. Ospino also testified, as discussed below, that Petitioner
27 gave him the letter before the verdict, Ospino informed the Court of
   its existence, but then only filed it after the verdict when Petitioner
28 complained that it had never been filed. (RT at 2855).

the letter in question.   Here, Petitioner spoke candidly about his representation by Ospino to the trial judge. (TR at 96-122, 2347-54.) Mr. Ospino stated that he and Petitioner were "getting along fine" and this meeting was "not in the nature of a *Marsden* or anything else like that." (RT at 2347).   Petitioner did not dispute this statement, although he was free to do so and spoke candidly and frequently about all of his complaints to the trial judge throughout the trial. During the *in camera* hearing, Ospino explained that Petitioner wished to call a number of his former girlfriends who would testify about his absence of violence in their relationships. Mr. Ospino explained why he thought this was a bad decision, and Petitioner explained why he wanted to call them.   The trial judge stated that this was a matter for defense counsel to decide and he would not interfere. (TR at 2352).   Petitioner never requested that counsel be replaced.

The issue of the *Marsden* letter was also raised on May 23, 1997, the date set for sentencing.   On that date Attorney Joanne Harrold appeared as retained counsel for Petitioner and substituted in for Frank Ospino.   Ms. Harrold informed the court that she was seeking a continuance in which to file the motion for new trial.   Because there was new counsel in the case, the Court specifically informed Petitioner: "Your *Marsden* motion became irrelevant for today's purposes." (RT 2593).   Petitioner responded affirmatively. (*Id.*). The trial judge was apparently referencing the March 28, 1997 *Marsden* letter that Ospino filed with the court after the verdict.

Under *People v. Marsden*, 2 Cal. 3d 118 (1970), the trial court must make an inquiry when a defendant seeks to discharge his counsel and asserts inadequate representation. *Marsden*, 2 Cal. 3d at 123-24. In *Bland v. Department of Corrections*, 20 F.3d 1469 (9th Cir. 1994),

the Ninth Circuit held that "once a request for substitute counsel has occurred, inquiry is required." 20 F.3d at 1476 (citing *United States v. Robinson*, 913 F.2d 712, 716 (9th Cir. 1990)). In *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000), the court overruled *Bland* to the extent the case applied an abuse of discretion standard instead of the correct unreasonable application standard of AEDPA. 218 F.3d at 1025. However, the Ninth Circuit affirmed that "it is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for [a motion for new counsel]." *Id.*

The Court finds that the closed hearing held on March 5, 1997, in which the Petitioner was free to voice all of his concerns about counsel's representation to the trial judge outside the presence of the prosecutor, was sufficient to satisfy the requirements of *Schell* and *Marsden*, if in fact he submitted a letter requesting such a hearing before the close of trial. If he submitted the letter after the verdict, then, as the trial judge found on May 23, 1997, the substitution of retained counsel rendered the *Marsden* request moot. As the trial judge said to Petitioner's new counsel during the hearing on Petitioner's motion for a new trial, "Your client knows how to get a *Marsden* hearing. He has had plenty of them." Petitioner actively expressed his opinions and complaints throughout trial, and the trial judge exhibited admirable patience in allowing him to articulate his many complaints at length.[6] Petitioner received all

---

[6]For example, the trial court allowed Petitioner to speak in allocution for more than an hour prior to the pronouncement of sentence. (TR at 2971-3047). He also allowed him to speak candidly at other times, including at the *Marsden* hearing before trial and during the closed hearing before verdict March 5, 1997. (TR at 119-21, 2352).

of the process he was due. There was no Constitutional error.

G.    **The State Courts Properly Rejected Petitioner's Claim That The Jury Was Biased By The Comments Of A Juror Who Had Been A Social Worker**

Petitioner claims that the jury was biased and that he was denied a fair trial because Juror No. 8 was a licensed family counselor who used to counsel clients who were victims of family violence.    Petitioner claims that Juror NO. 8 made prejudicial comments during jury selection.

During voir dire, Juror No. 8 stated that he or she could be a fair juror. (Voir Dire TR at 134-39). Juror No. 8 stated that domestic violence is a difficult problem because "[v]iolence begets violence." (TR at 135). Juror No. 8 agreed with Petitioner's trial counsel that women could commit crimes of domestic violence, including trying to kill a man. (TR at 136). When questioned by the prosecutor, Juror No. 8 agreed that victims of an abusive relationship may remain in such a relationship for some period of time. (Voir Dire TR at 137-38). Although lacking personal experience in such cases, Juror No. 8 had heard of cases in which a person attempts to kill their spouse and then commits suicide. (Voir Dire TR at 138-39). Petitioner did not move for a mistrial based on any of the answers of Juror No. 8 and, in fact, accepted the jury with the juror as a member. Petitioner does not explain how the comments of Juror No. 8 were prejudicial or tainted the other jurors.

The Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).    Actual bias against a defendant on a juror's part is sufficient to taint an entire trial.    *See United States v.*

*Allsup*, 566 F.2d 68, 71 (9th Cir. 1977). In extraordinary circumstances, "courts may presume bias based on the circumstances." *Dyer v. Calderon*, 151 F.3d 970, 981 (9th Cir. 1998)(*en banc*); *see also McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556-57 (1984)(accepting that "in exceptional circumstances, that the facts are such that bias is to be inferred"); *United States v. Wood*, 299 U.S. 123, 133 (1936); *Smith v. Phillips*, 455 U.S. 209, 221-24 (1982)(O'Connor, J., concurring).

The Ninth Circuit has found implied bias where (1) a juror has prejudicial information about the defendant; (2) a juror has a personal connection to the defendant, victim, or witnesses; or (3) a juror or a close relative of the juror has been involved in a situation involving similar facts. *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1062 (9th Cir. 1997); *see also Dyer*, 151 F.3d at 973 (implying bias from juror's pattern of lying about similar crime perpetrated against her relative). Extreme instances of juror deception may also permit a finding of implied bias. *See Green v. White*, 232 F.3d 671, 677-78 (9th Cir. 2000) (implying bias from juror's excessive, deliberate lies).

Petitioner has not made a showing of actual or implied bias. Juror No. 8's comments did not deny Petitioner the right to a fair trial, nor did the fact that she was a licensed family counselor. Relief is not warranted.

**H.   The State Courts Properly Denied Relief on Petitioner's Claim of Juror Misconduct**

As he did on direct appeal, Petitioner contends that he should be granted relief on the basis that the jury engaged in an improper experiment during deliberations by using an umbrella to demonstrate

the angle of the bullet wound to the victim.

Pathologist David Katsuyama testified that the bullet that entered Dawn Hill's chest had traveled in a downward direction at close to a 45 degree angle. (TR at 1088). Katsuyama did not observe any gunpowder stippling by the wound. (TR at 1093). A bullet was recovered from Hill's back. Katsuyama was unable to determine the posture of Hill's body when the wound was inflicted. (TR at 1104-06). Hill could have either been standing upright or bending over. (TR at 1105-06).

A bullet was recovered from the bathroom floor. (TR at 1250). The bullet hit a piece of door molding after it had penetrated something else which had slowed it down. (TR at 1251-54). Sheriff's Department Criminalist Loren Sugarman was unable to determine the position of the shooter when that shot was fired. (TR at 1255-56, 1259-66).

In its rebuttal case, the prosecution introduced a stipulation that Dr. Katsuyama, if recalled as a witness, would testify that the angle of the trajectory of the bullet into Hill's body was about 45 degrees downward. (TR at 2151). The defense did not present any evidence concerning the angle of the bullet wound or the distance of the gun from Hill when the fatal bullet was fired.

After Petitioner was convicted, a new attorney retained by him filed a motion for a new trial, alleging numerous grounds for relief. (CT at 784-827). In the motion, Petitioner claimed the jury committed misconduct by conducting an experiment with an umbrella. (CT at 817-20).

During jury deliberations, the court informed counsel that it had found out that one of the jurors had asked the bailiff if he

24

could bring a tape measure into the jury room. (TR at 2577). The court told the jury that it could not use anything that was not introduced into evidence. (TR at 2577). Petitioner's new counsel obtained declarations from some jurors stating that an umbrella had been used to determine distances and to trace the trajectory of the wound to the victim in order to determine her position when she was shot. (TR at 2942-43).

The trial court found that the use of the umbrella did not constitute misconduct, and even if it was improper, the misconduct did not affect the verdict. The California Court of Appeal agreed, stating that no misconduct occurred because the umbrella was merely used "to assist in considering the angles, distances, and positions based on the evidence presented at trial." (Ct of Appeal Opinion, 11).

Under *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), a defendant is entitled to a jury that reaches a verdict on the basis of evidence produced at trial, exclusive of "extrinsic evidence." *United States v. Navarro-Garcia*, 926 F.2d 818, 821-22 (9th Cir.1991) (noting instances in which "a juror's personal experiences may constitute extrinsic evidence"); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir.1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court.").

Extrinsic evidence is that which is not presented at trial, but rather acquired through out-of-court experiments or otherwise. See *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir.1987); cf. *United States v. Brewer*, 783 F.2d 841, 843 (9th Cir.) (magnifying glass, which was not admitted into evidence but which the jurors used to

examine photographic evidence, was not "extrinsic evidence" because no one asserted that the jurors understood the magnifying glass itself to have any bearing on the case), cert. denied, 479 U.S. 831, 107 S.Ct. 118, 93 L.Ed.2d 64 (1986).

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner*, 379 U.S. at 472-73, 85 S.Ct. 546 ( quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). Under *Turner*, 379 U.S. at 472-73, 85 S.Ct. 546, it is well-established law that a juror may not bring into the jury room evidence developed outside the witness stand such as the results of a juror's experiment conducted while the jury was on a weekend recess (*Navarro-Garcia*, 926 F.2d at 820) or legal research performed during the trial in an attempt to supplement inadequate instructions from the judge (*Bayramoglu*, 806 F.2d at 882).

When extrinsic evidence is presented to a jury that is considering a criminal case, the defendant is entitled to a new trial "if there exist[s] a reasonable possibility that the extrinsic material could have affected the verdict." *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir.1979). Such a possibility exists if the extrinsic evidence may have affected the reasoning of even one juror. *United States v. Vasquez*, 597 F.2d at 194; *U.S. v. Hendrix*, 549 F.2d 1225 at 1227 (9th Cir.1977). The "reasonable possibility" test of *Vasquez* is equivalent in severity to the harmless error rule applicable to constitutional errors under *Chapman v. California*, 386

26

U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Gibson v. Clanon*, 633 F.2d 851, 853 (9th Cir.1980), *cert. denied* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981).

In this case, the California Court of Appeal adopted the findings of the trial court, citing the trial judge's statement that "[t]he physical evidence, angles, distances, they were all diagramed and photographed for the jurors and . . . this is the type of evidence the jury concentrated on . . . The jury worked it out. The timing of the shots, the lack of powder, powder or soot on the victim . . ." (Ct. Of Appeal Opinion at 11).

The Court of Appeal continued:

> While the umbrella itself was not a trial exhibit, it was apparently used merely to assist in considering angles, distances, and positions based on the evidence presented at trial. Even assuming use of the umbrella constituted misconduct, the record fails to establish it either inherently or substantially influenced any juror; nor, in light of the surrounding circumstances, was its use under these circumstances substantially likely to cause a juror to be biased against defendant. *Id.*

This Court agrees with the California Court of Appeal that the umbrella was not extrinsic evidence and its use was not an improper experiment. The jurors merely used the umbrella as part of their common sense analysis of the extensive evidence presented at trial regarding angles, distances, and timing. This was not a case of one juror conducting an experiment outside of the court and bringing the results back to the jury room. Relief is not warranted.

\\

1    I.    **Petitioner's Was Not Denied the Effective Assistance of**
2          **Counsel**

3          Petitioner claims that his trial counsel rendered ineffective
4    assistance based on the substantive claims of error analyzed above.
5    None of Petitioner's substantive claims have merit and consequently,
6    none of his complaints concerning his trial counsel warrant relief.
7    The state courts acted reasonably by denying these claims.

8          The Sixth Amendment to the Constitution guarantees not only
9    assistance, but effective assistance, of counsel. *See Strickland v.*
10   *Washington*, 466 U.S. 668, 686 (1984). The purpose of the right is
11   to ensure a fair trial, and the benchmark for judging any claim of
12   ineffectiveness is "whether counsel's conduct so undermined the
13   proper functioning of the adversarial process that the trial cannot
14   be relied on as having produced a just result." *Id.* To prevail on
15   an ineffective assistance of counsel claim, a habeas petitioner must
16   show that (1) counsel's performance was "deficient," *i.e.*, his
17   "representation fell below an objective standard of reasonableness"
18   under prevailing professional norms, *id.* at 687-88, and (2) prejudice
19   flowed from counsel's performance, *i.e.*, that there is a reasonable
20   probability that, but for counsel's errors, the result of the
21   proceedings would have been different. *See id.* at 691-94.

22         Petitioner faults his trial counsel for failing to object to the
23   instructions concerning the other acts evidence. As explained
24   earlier, there is no merit to any of Petitioner's claims of
25   instructional error, insufficiency of the evidence claim, time credit
26   claim, *Marsden* claim and juror bias or misconduct challenges. Thus,
27   trial counsel's performance was not deficient and no prejudice
28   resulted from his failure to make futile requests and objections. *See*

1   *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996)(failure to take
2   futile action can never be deficient performance).

3       Petitioner also criticizes his counsel's failure to subpoena
4   Everett Burrell as a witness. Although Petitioner does not provide
5   any explanation of this claim in the present Petition, he stated in
6   his petition for a writ of habeas corpus in the California Supreme
7   Court that Burrell would have testified that shortly before the
8   shooting, he told Petitioner that Petitioner had just been hired as
9   a high-paying animator for a television series.[7] (Pet. Cal. Supreme
10  Ct. at 14.) Petitioner argued that the securing of a high-paying job
11  "would have refuted the prosecution's theory that petitioner was
12  using the decedent for financial reasons and the crime occurred as
13  a result of the decedent informing the petitioner that he had to
14  leave her residence thereby ending their relationship." *Id.*
15  Petitioner alleged that, after receiving news of his job, he began
16  packing up his motor home in order to live next to the animation
17  facility, and this triggered the attack by Dawn. *Id.* at 15.

18      A failure by trial counsel to conduct a reasonable investigation
19  and present mitigating evidence may constitute ineffective assistance
20  of counsel. *Rompilla v. Beard*,__ U.S. __, 125 S. Ct. 2456, 2005 U.S.
21  LEXIS 4846 (2005); *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527
22  (2003); *Jennings v. Woodford*, 290 F.3d 1006, 1013-14 (9th Cir.
23  2002)(trial counsel's decisions must be reasonable and well-informed,
24  and failure to gather evidence upon which to make such decisions was
25  ineffective assistance). Additionally, the United States Court of
26  Appeals for the Ninth Circuit has held that the failure to "consider

27  _____

28  [7] Petitioner did not submit a declaration from Everett Burrell with
    any of his petitions.

1   alternate defenses constitutes deficient performance when the
2   attorney neither conducts a reasonable investigation nor makes a
3   showing of strategic reasons for failing to do so." *Rios v. Rocha*,
4   299 F.3d 796, 805 (9th Cir. 2002)(attorney's failure to speak with
5   more than one witness constituted ineffective assistance).

6       Here, Petitioner has not shown that counsel was deficient or
7   that he was prejudiced. The prosecution never claimed that the murder
8   was motivated by financial concerns. Petitioner has not shown a
9   reasonable likelihood that admission of the evidence would have
10  produced a different result. No evidentiary hearing is required to
11  resolve this issue.

12  **J.  Petitioner Was Not Denied the Effective Assistance of**
13      **Appellate Counsel**

14      Petitioner also complains that his appointed counsel on direct
15  appeal was ineffective because that counsel failed to raise some of
16  the same issues that his trial counsel failed to raise, as well as
17  failing to raise a claim of ineffective assistance of trial counsel.
18  However, as discussed above, Petitioner's trial counsel was not
19  ineffective.  Petitioner also asserts that his counsel on appeal
20  failed to argue that Petitioner's conviction "was the result of
21  judicial and prosecutorial misconduct." However, Petitioner does not
22  state what this alleged misconduct was.  Consequently, Petitioner's
23  claim of ineffective assistance of appellate counsel is without
24  merit.
25  \\
26  \\
27  \\
28  \\

IV.   **Recommendation**

    For the reasons stated above, the Court finds that the decision of the California state courts denying Petitioner relief on the claims presented were objectively reasonable.  It is recommended that the Petition for Writ of Habeas Corpus be **DENIED**.

DATED: April 4, 2006

 

Marc L. Goldman
United States Magistrate Judge